## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

PHILIP HALL, on behalf of himself
and all others similarly situated,

                Plaintiff,

v.

OMEGA FLEX, INC.,

                Defendant.

_____/

CASE NO.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Philip G. Hall, by and through undersigned counsel, brings this action on his own behalf and on behalf of a Class of persons defined below against Defendant Omega Flex, Inc. ("Omega Flex") and for his Complaint alleges, upon information and belief and based on the investigation to date of his counsel, as follows:

### NATURE OF THE ACTION

1. This is a statewide class action brought by Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure on his own behalf and on behalf of a Class of all similarly situated property owners, against Omega Flex. Omega Flex manufactured, distributed, and supplied TracPipe® corrugated stainless steel tubing ("CSST") throughout the United States, including Florida.

2. CSST is an ultrathin, flexible piping used to transport natural gas within both residential and commercial structures. It was developed as an alternative to the much thicker, more durable black iron pipe that has been used to transport gas within residential and commercial structures for more than a century.

3.      This action alleges that Omega Flex improperly designed and manufactured TracPipe® and failed to properly test its resistance to lightning strikes.  TracPipe's thin walls are susceptible to perforation by an electrical arc generated by a lightning strike, which can cause and has caused fires, damage to and destruction of residential structures, and creates a substantial and unreasonable risk of death or personal injury.

4.      For instance, in Lubbock, Texas in August 2012, one person was killed and another seriously injured when a lightning strike punctured the CSST in a house, instigating a natural gas-fueled fire.  Fire and smoke damage affected the entire structure.

5.      It is well documented that TracPipe® CSST can fail catastrophically in the presence of lightning.  *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation                    (April                    2011),                    *available*                    *at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf.  When the gas line becomes energized, the energy from the lightning strike passes through it in search of a path to ground.  As it seeks a path to ground, the energy from the lightning strike may jump off the CSST, usually through the air to another nearby conductive material, in what is known as an arcing event.  The temperature generated by this lightning-induced event is measured in thousands of degrees, which is easily hot enough to melt and penetrate through the thin skin of the CSST, even though the arcs last only a fraction of a second. When the gas line melts, gas inside is allowed to escape and is ignited by the melting event, causing a gas-fueled fire.

6.      A 2005 expert reported prepared by Mark Goodson, a specialist in electrical and mechanical failure analysis, concluded: "CSST fails when the CSST is contacted by electrical

current associated with lightning.  Due to its uniform design, all CSST fails in the same manner when insulted by lightning: electricity contacts the CSST, the CSST acts as a conduit for the electrical current, the electricity perforates the pipe and permits gas to escape.  During this process, there is ignition of the escaping gas.  This problem uniformly affects all CSST brands, in that the products have the same inherent design, thickness (or lack thereof) and physical properties."  Mark Goodson and Mark Hergenrether, "*The Causal Link Between Lightning Strikes, CSST, And Fire*," Fire and Arson Investigator (October 2005), available at http://goodsonengineering.com/wp-content/uploads/2011/08/InvestigatingtheCasualLinkBetweenLightningStrikesCSSTFire.pdf.

7.      After concluding that TracPipe® was deficient, Omega Flex developed CounterStrike® in 2004, which purportedly contains all the features of TracPipe®, plus a plastic jacket with an insulation value of at least 25,000 volts to protect it from lightning damage. Omega Flex phased out the manufacture and sale of TracPipe® in 2011.

8.      The presence of TracPipe® in Plaintiff and Class Members' structures creates an unreasonable risk of fire due to lightning strikes.

**THE PARTIES**

9.      Plaintiff Philip G. Hall is a resident of Florida and is the owner of a house located in Florida in which TracPipe® CSST is used to service a gas stove.  TracPipe® was installed in his home at the time it was built in or around 2010.

10.     Plaintiff, on behalf of himself and all other persons and entities similarly situated, brings this action for and on behalf of the owners of all residential and commercial structures with TracPipe®.  TracPipe® is defective, should never have been sold, and needs to be removed and replaced from all structures.

11.     Defendant, Omega Flex, Inc. (hereinafter "Omega Flex") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania having its principal place of business and a headquarters located at 451 Creamery Way in Exton, Pennsylvania.

12.     At all times relevant hereto, Omega Flex was in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST under the brand name "TracPipe®."

## JURISDICTION AND VENUE

13.     Between 2000 and the present, thousands of homes in Florida, perhaps tens of thousands, were constructed with CSST.  Omega Flex has an estimated 50% share of the CSST market.  It follows that thousands of homes in Florida were built with TracPipe®.

14.     The average estimated cost of removing and replacing CSST with lead gas pipe in these homes is in excess of $3,000.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction), in that (i) there is complete diversity (Plaintiff is a citizen of Florida and Defendant is incorporated in Pennsylvania, and to the extent pertinent, maintains its principal place of business in Pennsylvania, (ii) the amount in controversy exceeds $5,000,000.00 (Five-Million Dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff class.

16.     Venue lies in this District, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this Judicial District. In addition, Defendant does business and/or transacts business in this Judicial District, and has intentionally availed itself of the laws and markets within this District through the distribution,

marketing and sale of TracPipe® in this District, and therefore is subject to personal jurisdiction in this Judicial District and resides here for venue purposes.

## FACTUAL BACKGROUND OF CSST

17. CSST was initially developed in Japan during the early 1980's as a safe and effective gas distribution system that can withstand damages that can occur during earthquakes and other natural disasters. CSST has been used in Japan and Europe since 1980, and was introduced in the USA in 1989.

18. The history of CSST coverage in the USA started in 1983 from a research and development project sponsored by the Gas Research Institute.

19. The initial standards were developed by the American Gas Association Laboratories and were designated in 1987 as AGA 1-87.

20. The introduction of CSST into the United States was brought about by the firm Foster-Miller. According to the The National Fire Protection Association, when CSST was first considered in 1988, lightning was given no consideration.

21. CSST was first recognized by the National Fire Protection Association in the *Fuel Gas Code* NFPA 54 in 1988. In 1989, the National Fuel Gas Code introduced coverage of CSST.

22. The International Association of Plumbing and Mechanical Officials approved CSST for inclusion in its 2003 Uniform Plumbing Code which opened the doors for CSST in all 50 states.

23. The CSST system consists of flexible pipe between the building gas source and appliances, as well as fittings and other accessories. The flexibility of the tube allows it to be routed through the building in continuous lengths without the many joints required with rigid

5

piping and without the need for any special tools.  The flexible gas piping market in the U.S. is currently concentrated in the residential housing market.

24.     There are approximately ten manufacturers of flexible metal hose in the United States.  The U.S. manufacturers include Omega Flex Inc., Titeflex Corporation, Ward Manufacturing, Truflex, Microflex, U.S. Hose, Hose Master, and several smaller privately held companies.

25.     CSST is made from 300 series stainless steel and is more expensive than an equivalent length of iron pipe.

26.     According to industry experts, "CSST has revolutionized the gas-distribution business.  It is easy to use and this lowers the cost over the entire installation.  Back-breaking black iron pipe projects that demanded eight or 10 laborers can now be handled with ease by only one or two certified CSST installers – freeing up precious labor for other tasks that will keep projects moving forward.  Lightweight and flexible [Gastite] CSST will typically slash installation time by 50% or more."  Mary Jo Martin, "*In Less than Two Years, Gastite Establishes Strong Position in Market*," The Wholesaler (March 2009), available at http://www.thewholesaler.com/march_09/gastite_feature.php.

27.     The advantages of CSST over traditional black iron pipe also include lower overall installation costs because it can be installed in long uninterrupted lines within the building.

28.     As of March 2013, CSST commands slightly over one-half of the market for fuel gas piping in new and remodeled residential construction in the United States.  Rigid iron pipe, and to a lesser degree copper tubing, accounts for the remainder of the market.

29.     To date, over 750 million feet of CSST has been installed in over 5 million homes across the United States.  Omega Flex, *CSST vs. Black Iron Pipe*, CSST Facts (2013), available at http://www.csstfacts.org/csst-vs-black-iron-pipe.aspx.

### DANGERS OF LIGHTNING AND CSST

30.     CSST is likely to fail when exposed to electrical insult, particularly lightning.  *See* Mark Goodson and Mark Hergenrether, "*Lightning Induced CSST fires*" (August 2011), available at http://goodsonengineering.com/wp-content/uploads/2011/08/p379-Goodson-TB1140_web.pdf.  Gas piping systems are particularly susceptible to damage because they are a potential conductive path for lightning energy, and are likely to be routed near other metal utility lines inside the house.

31.     In an indirect lightning strike, a strike close to a structure or house generates a partial lightning current in the metal links of the building.  This electrical energy in attempting to reach ground may arc between metal systems that have different electrical resistance.  Arcing can cause damage to the metal systems.

32.     Damage caused by a direct or indirect lightning strike to a CSST system can be described as a small puncture of the tubing wall.  This type of damage is caused by an arc of energy "jumping" from a pathway of higher potential to a pathway of lower potential in an effort to find a lower impedance pathway to ground.  A puncture in the tubing wall can ignite the natural gas at the hole.  This gas can ignite surrounding materials and spread to create an extensive fire, resulting in significant damage to the house and destruction of all of the contents of the house.  This type of damage appears to be consistent around the country.

33.     In standard CSST systems, an electrical bond between the CSST and the building's grounding electrode *might* address this issue. Bonding is the process of making an

electrical connection between the grounding electrode and any equipment, appliance or metal conductor.  Bonding of CSST to a common grounding electrode allows the energy to move at the same rate as the electrical system in unison with the energy wave.  The requirement for bonding and grounding is very specific depending on the area's building codes.  Florida has the most stringent building codes and practices, including a requirement for bonding.  The provisions for grounding of the electrical system and bonding other metallic systems are contained in the National Electric Code (NEC NFPA 70) and the National Fuel Gas Code (NFGC NFPA 54).

34.    Even if all mechanical and electrical systems of the building are properly bonded, the risk of a CSST induced fire is still present.

35.    Omega Flex is instructing direct installation of TracPipe® with a bonding wire between the TracPipe® gas piping and the building's ground electrode.  Even with code-compliant and manufacturer-recommended bonding, however, TracPipe® is not immune to the risk of damage that can be caused by lightning.

36.    In fact, these codes are minimum standards that continue to be under review.  Year after year, the standards continue to change, yet prior installations do not benefit from more stringent changes.

37.    An expert on gas piping opined that "CSST manufacturers give installers and building inspectors way too much lease in expecting them to do their jobs right.  Even when the job is 'done right,' there is still the opportunity for the CSST to become a conduit for lightning to ground.  Many installers believe that connecting their CSST to an electrical panel with a bond wire is acceptable, but what most do not realize is that a lot of electrical panels are not properly grounded to terra firma."   According to his professional opinion, "If you leave CSST in your building, then you are gambling or are just plain stupid." John Rocheleau, "*CSST Gas*

*Pipe/Lightning   Fires*,"   Protech   HVAC   (August   1,   2012),   available   at
http://www.protechhvac.com/tag/csst/.

38.     Mark Goodson, an expert in electrical and mechanical failure analysis, has
recommended the following three remediations to prevent CSST induced fires, including
complete removal of CSST from the structure:  "(1) convert the structure to electricity only and
remove all gas delivery; (2) retain gas but remove all CSST from the structure and install black
iron pipe; or (3) prevent lightning from contacting the CSST which would prevent perforation
and ensuing fire – i.e., install a NFPA 780 type lightning arrestor system.  Without paying for the
costs associated with one of these three solutions, homes or structures containing the CSST are
subject to fire due to the uniform failure when electrical current caused by lightning contacts the
CSST."  Mark Goodson and Mark Hergenrether, "*The Causal Link Between Lightning Strikes,
CSST,   And   Fire*,"   Fire   and   Arson   Investigator   (October   2005),   available   at
http://goodsonengineering.com/wp-
content/uploads/2011/08/InvestigatingtheCasualLinkBetweenLightningStrikesCSSTFire.pdf
(emphasis added).

39.     The dangers resulting from CSST and lightning strikes have resulted in the Frisco,
Texas Fire Department and the Arlington, Texas Fire Department seeking to ban CSST.

40.     As of  August 2011, 141 fires involving lightning and CSST have been reported
throughout the United States.  *See* SEFTIM, *Final Report for Validation of Installation Methods
for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research
Foundation   (April   2011),   *available   at*
http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20
Report.pdf.

9

### BACKGROUND OF OMEGA FLEX

41.     Omega Flex is a leading manufacturer of flexible metal hose, which is used in a variety of applications to carry gases and liquids within their particular applications. The company manufactures flexible metal hose at its facility in Exton, Pennsylvania, with a minor amount of manufacturing performed in the United Kingdom.  The company sells its product through distributors, wholesalers and to original equipment manufacturers throughout North America, and in certain European markets.  Most of its employees are located in its manufacturing facility in Exton, Pennsylvania.

42.     Since 1975, Omega Flex has led the piping industry, with more than 90 patents. It claims it is "the pre-eminent international producer of quality engineered flexible metallic piping products."

43.     In 1997, the Company introduced TracPipe®, which it called the "finest CSST system on the market that when properly installed makes likelihood of damage to the system from natural occurrences very small."

44.     In 2004, the Company developed CounterStrike®, which contains all of the features of TracPipe® plus a plastic jacket with an insulation value of at least 25,000 volts to protect it from lightning damage.  CounterStrike® was a specific product developed to address the induced lightning concern.

45.     After even further testing, a second generation of TracPipe® CounterStrike® was introduced in 2007.  It purportedly not only increased the product's resistance to energy, but also exceeded fire and smoke requirements, permitting it to be installed in firewalls and return air plenums.  The improved version of TracPipe® CounterStrike® has been tested by LTI and, according to Omega Flex, was shown to be up to 400 times more resistant to the damaging

10

effects of electrical energy than conventional CSST, and is at least six times more resistant to the damage than the first version of TracPipe® CounterStrike®.

46.     As of September 1, 2011, Omega Flex has transitioned its traditional CSST products exclusively to CounterStrike®.

**OMEGA FLEX KNEW TRACPIPE® WAS DEFECTIVE**

47.     Upon information and belief, TracPipe® was not designed to withstand the massive and unpredictable energy associated with an indirect lightning strike.

48.     Omega Flex has known since at least October 2002 that its TracPipe® CSST fails when subjected to an electrical charge from an indirect or direct lightning strike.

49.     Specifically, Omega Flex began testing TracPipe® in 2003 to determine the mechanisms by which the CSST could be damaged by electrical arcing.  The company worked with Lightning Technologies ("LTI"), which operates one of the world's most complete, accredited, simulated-lightning test laboratories.  LTI developed a number of tests and created a protocol using waveforms to simulate electrical arcing within a building.

50.     LTI tested TracPipe® to determine how much electrical energy the CSST could withstand before failing.  Omega Flex discovered that its CSST failed at a level below the energy generated by lightning.  *See TracPipe®  CounterStrike® White Paper*, Omega Flex, (November      2011),      *available      at*      http://www.tracpipe.com/Customer-Content/WWW/CMS/files/FGP-611G-TPCS_Whitepaper-FINAL11-11.pdf.

51.     Based on this research, Omega Flex determined that it needed to increase the thickness of the yellow jacket of the CSST to resist voltage.

52.     In or about 2004, Omega Flex began developing and marketing a different product - CounterStrike® - that was designed to better dissipate and withstand the electrical

charge from lightning, instead of acting as an insulator. Omega Flex used the test data to tout the capabilities of its new product over its original CSST, but it failed to use that data to warn distributors, builders, installers and the ultimate homeowners of the propensity of TracPipe® CSST to fail in the event of lightning and that such failure can cause a gas-fed fire.

53. The conductive black jacket added to TracPipe® CounterStrike® improves its ability to dissipate arcing energy, reducing the level as it moves downstream which helps to protect regulators, appliance connectors and other mechanical systems, all of which could result in the potential for fire.

54. Based upon the test date and subsequent improvements to TracPipe®, Omega knew or should have known, prior to Plaintiff's installation of the TracPipe® CSST in this case, that the CSST presented an unreasonable risk of failure when subjected to energy from an indirect lightning strike.

55. Despite this knowledge, Omega Flex failed to sufficiently warn Plaintiff and the Class or their contractor or subcontractors of the unreasonable risk of failure of the CSST when subjected to energy from an indirect lightning strike.

**OMEGA FLEX FAILED TO ADEQUATELY TEST TRACPIPE**

56. An April 2011 study conducted by SEFTIM addresses the CSST failure scenario and suggests the need for significant testing in an effort to "mitigate" lightning related damage. *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011), *available                                                                                    at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf (the "Report"). The Report was issued by the Fire Protection Research Foundation, a

group that consists of members of NFPA, the National Electrical Contractors Association, the U.S. Army, the New Mexico Institute of Technology, and three private engineering firms, among others. Significantly, the sponsors of the study included numerous CSST manufacturers. The Report recognized the need to conduct numerous tests in an effort to reduce the hazards of the product.

57.     The Report provided numerous examples of CSST failure scenarios and attempted to offer solutions, which it also calls "mitigations," to address future CSST failure scenarios. The Report cautioned that merely bonding the CSST at its starting and/or ending point may not be sufficient and that "a global equipotential solution is necessary to achieve a complete solution." The "mitigations" would include the following possibilities if supported by testing: multiple bonding, bonding with a short length of conductor, requiring minimum bends, requiring a separation distance from another metallic circuit (such as a chimney flue or cable), and a design change that would enhance the ability to withstand a lightning surge. The Report noted that some manufacturers already included some of these requirements in their prior "installation rules." But the Report cautioned: "However, based on some studied CSST cases, holes do not always occur where the distance between the CSST and a metallic part is the smallest, and thus separation distance may be difficult to address." It also cautioned that none of these potential solutions may actually work: testing was still needed to show that they will, in fact, work.

58.     According to the Report, several tests of CSST had yet to be done. The recommended testing is summarized in the Conclusion section, as follows:

> a.  "Simulations are needed to show if separation distance is needed based on bonding conductor length and possible lightning currents given from the standard database. Bonding conductors located at the entrance may not be enough if the bonding conductors are too long. In that case, multiple bonding or separation distance may solve the problem (please note that a few cases

have shown that incidents occurred in spite of apparent sufficient separation distance).”

b.   “Tests should be made to check the ability of CSST to withstand small fault current for a long time, as well as higher fault current for a shorter time. It should be confirmed that multiple bonding is unlikely to create a major problem when surge current is flowing along CSST.”

c.   “Tests should be performed to identify the impedance (mainly inductance) of CSST per unit measure.”

d.   “Tests to determine CSST impedance should incorporate the maximum bending radius as given in technical brochures. The effect of bends should be investigated.”

e.   “Tests should be performed with 8/20 impulses (representing induced surges) to see if this can damage CSST if multiple bonding is not provided.”

These needed tests and simulations would allow CSST manufacturers to adequately determine if multiple bonding is necessary or not.

59.     Based upon information and belief, Omega Flex did not conduct these tests on TracPipe. Omega Flex did not begin testing the product until 2003, six years after it was introduced on the market, and it did not test and to date has not tested the product adequately under actual installed conditions.  *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research        Foundation        (April        2011),        *available        at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf (the “Report”).

60.     According to the Report, testing of CSST under actual installed conditions using transient waveforms can show further limitations that conventional bonding and grounding cannot accommodate.  Omega Flex’s lab test conditions are specified and do not duplicate the actual energy conditions generated by direct or indirect lightning strikes.

14

61.     Accordingly, Omega Flex failed to test TracPipe's ability to withstand such energy when bonded.   Adequate testing would have revealed the serious deficiencies in TracPipe® in that it would have solidified the knowledge of the link between TracPipe® and natural gas fires resulting from lightning strikes.

## PREVIOUS AND PENDING LITIGATION INVOLVING OMEGAFLEX

62.     TracPipe® can fail catastrophically as a result of a direct or indirect lightning strike.  This phenomenon explains why TracPipe® has been the subject of one nationwide class action; why it has been banned in certain jurisdictions; why Omega Flex stopped selling it in 2011; why it was found in October 2010 to be a defective product by a Pennsylvania jury through a verdict of nearly $1 million; and why the National Fire Protection Association, the publisher of the *National Fuel Gas Code,* has the product currently under review.  There has been an increase in the frequency of litigation concerning TracPipe® in the last few years.

63.     A class-action lawsuit, *Lovelis, et al. v. Titeflex, et al*., Case No. Civ-2004-211 (Arkansas Circuit Court, Clark County) filed in Arkansas in 2004 against several manufacturers, including Omega Flex, claimed CSST posed an unreasonable risk of fire from lightning strikes, leading to a 2006 settlement.   Both Omega Flex and the other defendants denied these allegations, and denied any wrongdoing or legal liability, but agreed to settle this matter to avoid further cost and the uncertainty and risk of the outcome of further litigation. Under the Settlement Agreement, Omega Flex agreed to pay the value of each payment voucher redeemed by a class member for the installation of a lightning protection system or bonding and grounding of the company's CSST product. The settlement class involved "all persons and/or entities who own real property or structures in the United States in which CSST manufactured by the Settling

Defendants was installed as of September 5, 2006." It is unknown how many class members received this notice.

64.     In October 2010, Omega Flex took the first case relating to CSST and lightning to trial, *Tincher v. Omega Flex, Inc*., No. 2008-00974-CA (Pennsylvania, Chester Co. Com. Pleas, Oct. 20, 2010). Terence and Judith Tincher, the plaintiffs, purchased a house that was plumbed with TracPipe® flexible gas supply lines in 1998. During a thunderstorm in June 2007, a lightning strike energized the line beneath the first floor of the house. The resulting electrical arc created a hole in the piping, igniting natural gas. A large fire erupted, causing a structural collapse in the center of the house. The house and its contents were a total loss. Following an eight day trial, the jury found CSST to be a defective product and imposed strict liability against Omega Flex. Omega Flex argued that a properly bonded CSST system could withstand the energy produced from an indirect lightning strike but Omega Flex's failure to ever test TracPipe® ability to withstand such energy, when properly bonded, proved fatal to its defense. At trial, expert testimony established that TracPipe® has substantially greater susceptibility to perforation by lightning-induced energy than does black iron pipe, rendering it defective and posing a substantially greater fire hazard. The jury awarded 100% recovery of both the subrogated and uninsured losses, for a total judgment that exceeded $1,000,000.00.

65.     In *AIU Insurance Co. v. Omega Flex, Inc*., Case No. 3:11-cv-00023 (W.D. Va. April 3, 2012), a lightning strike that "struck at or near the property" created a hole in Omega Flex's TracPipe® from which natural gas escaped, ignited, and caused a fire at the property of AIU's subrogee. AIU filed a subrogation action against Omega Flex and the parties reached a confidential settlement on September 24, 2012.

66.     Three other cases are currently pending against Omega Flex:

| Case Name | Allegations | Status |
|---|---|---|
| *Cincinnati Insurance Co. v. Omega Flex, Inc.*, No. 3:10-cv-00670-JDM (W.D. Ky. Sept. 28, 2010) | The complaint alleges that, on or about May 27, 2009, lightning struck the personal property of the Cincinnati Insurance Company's insureds and caused a failure in a TracPipe® brand CSST line, which caused a fire that resulted in significant structural damage to the property. | A jury trial was held on April 9, 2013, but the Court dismissed the entire jury pool on April 10, 2013. A new trial date has not been set. |
| *Allstate Property & Casualty Insurance Co v. Omega Flex, Inc.*, No. 1:13-cv-339-WTL-MJD (S.D. Ind. Mar. 1, 2013) | This was a subrogation action stemming from three separate fires that occurred at the houses of individuals insured by Allstate following "close proximity lightning strikes." Allstate alleged each house contained TracPipe®, designed and manufactured by Omega Flex, and asserted strict product liability and negligence claims against Omega Flex alleging the TracPipe® was defective, unreasonably dangerous and caused the fires. | The Southern District of Indiana severed the claims into three separate cases. Amended complaints and answers have been filed. |
| *Fidelity and Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.*, Case No. 12-2588 (NLH/KMW) (D.N.J. March 26, 2013) | Fidelity brought this action as subrogee of its insured, Ralph Santaniello, seeking to recover payments previously made to Santaniello under a homeowners' insurance policy as a result of a fire at Santaniello's house that occurred on or about May 14, 2010. According to the allegations, a "lightning strike occurred at or near the Santaniello home that energized the [TracPipe®], which failed and punctured." | On March 26, 2013, the Court granted in part and denied in part Drexel's motion to dismiss. All parties are presently in discovery. |

## REPRESENTATIVE PLAINTIFF PHILIP HALL

67.     Plaintiff is the owner of a home located in Florida that has TracPipe® manufactured by Omega Flex installed in his home.

68.     Photographs of Plaintiff's home show TracPipe®:



69.     Plaintiff, like other members of the Class, did not change or alter TracPipe® since the time it left Omega Flex's control.

70.     Plaintiff and members of the Class have suffered damages as a result of Defendant's sale of defective products and their deceptive practices.  While Plaintiff and the Class are forced to repair and/or replace TracPipe®, they have neither been reimbursed for or advanced the costs associated with this undertaking.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and a Class defined as follows:

> All persons in the State of Florida who own a house, or other structure, on which Omega Flex's TracPipe® is installed.

Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Omega Flex and any entity in which Omega Flex has a controlling interest

18

or which has a controlling interest in Omega Flex and its legal representatives, assigns and successors of Omega Flex; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

72.     *Numerosity:* The Class is composed of thousands of persons in the State of Florida, the joinder of whom in one action is impractical.  Between 2000 and the present, thousands of homes in Florida, perhaps tens of thousands, were constructed with CSST.  Omega Flex has an estimated 50% share of the CSST market.  It follows that thousands of homes in Florida were built with TracPipe®.  Moreover, upon information and belief, the Class is ascertainable and identifiable from Omega Flex's records or identifying marks on the CSST.

73.     *Commonality:* Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual issues include the following:

a.  Whether TracPipe® is inherently defective;

b.  Whether TracPipe® was in an unreasonably dangerous condition when it was manufactured and distributed;

c.  Whether TracPipe® was reasonably safe for its intended use as manufactured and designed;

d.  Whether Omega Flex knew or should have known of the defect;

e.  Whether Omega Flex concealed from consumers and/or failed to disclose to consumers the defect;

f.  Whether Omega Flex failed to provide adequate installation instructions;

g.  Whether Omega Flex failed to adequately test for potential defects in TracPipe®;

h.  Whether Omega Flex failed to adequately warn of the foreseeable risks associated with using TracPipe®;

      i.   Whether Omega Flex omitted critical information regarding defects in its product in its marketing, sales and installation materials;

      j.   Whether Plaintiff and the Class are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of the Class for replacement of TracPipe® and/or installation costs; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between TracPipe® as warranted and TracPipe® containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in TracPipe®;

      k.   Whether Plaintiff and the Class are entitled to all costs associated with replacement of their defective TracPipe® with non-defective CSST; and

      l.   Whether Plaintiff and the Class are entitled to restitution and/or disgorgement.

74.    *Typicality:* Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Omega Flex's conduct in designing, manufacturing, marketing, advertising and selling the defective TracPipe® and Omega Flex's conduct in concealing the defect in the TracPipe® to owners, contractors, developers, and suppliers.

75.    *Adequate Representation:* Plaintiff will fairly and adequately protect the interests of the members of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including consumer class actions involving breach of warranties, product liability and product design defects.

76.    *Predominance and Superiority:* This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable. Should individual Class members be required to bring separate actions, this Court and courts throughout Florida would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent

rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

**COUNT I**
**Strict Liability – Design and Manufacturing Defect**

77.     The allegations contained in paragraphs 1-76 are incorporated herein by reference as if fully set forth.

78.     At all times relevant hereto, Omega Flex was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST piping, including the TracPipe® CSST piping installed at Plaintiff and Class Members' houses.

79.     At all times relevant hereto, TracPipe® was designed and placed into the stream of commerce by Omega Flex.

80.     Omega Flex designed, formulated, tested, manufactured, inspected, marketed, distributed, supplied and/or sold TracPipe® that was defective in design and/or manufacture when the product left the hands of the Defendant. The foreseeable risk from installing TracPipe® exceeded any potential benefits associated with the design and/or manufacture of it.

81.     Ultimately, Omega Flex took the product off the market.

82.     TracPipe® manufactured by Omega Flex was expected to and did reach Plaintiff and Class Members' houses without substantial change in the condition in which it was designed, manufactured, tested, inspected, distributed, marketed or sold.

83.     Ultimately, TracPipe® designed, formulated, tested, manufactured, inspected, distributed, stored, marketed, supplied and/or sold by OmegaFlex was defective in design and/or manufacture in that, when the product left the hands of the designers, manufacturers, distributors

21

and/or suppliers, it was unreasonably dangerous, more dangerous than a homeowner would expect.

84.     Omega Flex knew, or should have known, that at all times mentioned herein, TracPipe® was inherently dangerous and unsafe because of its inability to adequately resist lightning strikes.

85.     Plaintiff and the Class, acting as reasonably prudent people, could not discover that TracPipe® was defective as mentioned herein, or perceive its danger.

86.     At the time of use of Omega Flex's TracPipe®, Plaintiff and the Class utilized the piping for the purposes and manner normally intended.

87.     By reason of the foregoing, Omega Flex is strictly liable in tort to Plaintiff and the Class for designing, manufacturing, testing, inspecting, distributing, marketing and/or selling TracPipe®.

88.     Said defects in TracPipe® were a substantial factor in causing Plaintiff and the Class damages and injuries and/or placing Plaintiff and the Class members at increased risk of damage and/or harm.

89.     As a direct, proximate, and foreseeable result of the defective condition of TracPipe® as manufactured and sold by Omega Flex, Plaintiff and the Class have suffered, and will continue to suffer, damages.

**COUNT II**
**Negligence – Design Defect: Failure to Test**

90.     The allegations contained in Paragraphs 1-89 are incorporated herein by reference as if fully set forth.

91.     Omega Flex did not perform adequate testing on TracPipe® that was defectively designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold to Plaintiff and the Class.

92.     Adequate testing would have revealed the serious deficiencies in the Defendant's TracPipe® in that it would have solidified the knowledge of the link between TracPipe and natural gas fires resulting from lightning strikes.

93.     Omega Flex had and continues to have a duty to exercise reasonable care to properly design, including the duty to test, its TracPipe® that it introduced into the stream of commerce, including a duty to ensure that TracPipe® does not cause its users, including the Plaintiff and Class, to suffer from unreasonably dangerous results as a result of using it.

94.     Omega Flex breached these duties by failing to exercise ordinary care in the design, specifically the testing of TracPipe®, which it introduced into the stream of commerce, because Omega Flex knew or should have known that TracPipe® created an unreasonable risk of fire and danger, and failed to do the appropriate testing.

95.     Omega Flex knew or should have known that consumers such as Plaintiff would foreseeably suffer economic damages or injury, and/or be at an increased risk of suffering damage and injury, as a result of its failure to exercise ordinary care in the design of the product by failing to do the appropriate testing.

96.     By reason of the foregoing, Plaintiff and the Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as financial damage and injury.

97.     As a direct and proximate result of the Defendant's failure to test TracPipe® designed, formulated, manufactured, inspected, distributed, marketed, warranted, advertised, supplied and/or sold by the Defendant, Plaintiff and the Class have suffered damages.

## COUNT III
## Negligence – Failure to Warn

98.     The allegations contained in Paragraphs 1-97 are incorporated herein by reference as if fully set forth.

99.     At all times mentioned herein, Omega Flex designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold TracPipe® to Plaintiff and the Class.

100.    At all times material hereto, the use of TracPipe® in a manner that was intended and/or reasonably foreseeable by Omega Flex involved substantial danger that would not be readily recognized by an ordinary user of TracPipe®.

101.    At all times material hereto, this danger was known or knowable by the Omega Flex, in light of the generally recognized and prevailing knowledge available at the time of manufacture and design, as described herein.

102.    Omega Flex, as the manufacturer of TracPipe®, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use.

103.    Omega Flex was negligent and breached its duty of care by negligently failing to give adequate warnings to purchasers and users of TracPipe®, including Plaintiff, about the unreasonably dangerous and defective condition of TracPipe®, the likelihood of CSST-induced fires, and the substantial and unreasonable risk of death or personal injury TracPipe® creates.

104.    Omega Flex failed to exercise reasonable care in their design, marketing, and sales so as to inform Plaintiff and the Class the dangers inherent associated with using TracPipe® in their structures.  Omega Flex failed to adequately warn Plaintiff of any dangers.

105.    Omega Flex knew, or by the exercise of reasonable care, should have known of the inherent design defects and resulting dangers associated with using TracPipe®, and knew

that Plaintiff and/or the Class could not reasonably ascertain these dangers.  Notwithstanding, Omega Flex failed to exercise reasonable care in providing consumers with adequate warnings.

106.    Despite the fact that Omega Flex knew or should have known that TracPipe® was associated with and/or could cause natural-gas fed fires and creates a substantial and unreasonable risk of death or personal injury, Omega Flex continued to market, manufacture, distribute and/or sell TracPipe® to consumers, including Plaintiff and the Class.

107.    As a direct and proximate result of Omega Flex's failure to adequately warn consumers of the dangerous properties of using TracPipe® in their structures, Plaintiff and the Class has suffered damages as set out herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and on behalf of all others similarly situated, prays for a judgment against Omega Flex as follows:

1.      For an order certifying the Class, pursuant to Rule 23, appointing Plaintiff as representative of the Class, and appointing the law firms representing Plaintiff as counsel for the Class;

2.      For compensatory damages sustained by Plaintiff and the Class;

3.      An award of costs as allowed by law;

4.      For both pre-judgment and post-judgment interest on any amounts awarded;

5.      For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

6.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

This the 3rd day of June, 2013.

WHITFIELD BRYSON & MASON LLP

*/s/J. Andrew Meyer*
Robert B. Brown III
Florida Bar No. 621609
WHITFIELD BRYSON & MASON LLP
3132 Ponce De Leon Blvd.
Coral Gables, FL 33134
Telephone: (305) 441-0440
Facsimile: (919) 600-5035

Gary E. Mason (to be admitted *pro hac vice*)
WHITFIELD BRYSON & MASON LLP
1625 Massachusetts Ave., NW
Suite 605
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

Daniel K. Bryson (to be admitted *pro hac vice*)
WHITFIELD BRYSON & MASON LLP
900 W. Morgan St.
Raleigh, NC 27603
Telephone: (919) 600-5002
Facsimile: (919) 600-5035

J. Andrew Meyer
Florida Bar No. 0056766
Rachel Soffin
Florida Bar No. 018054
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4787

Charles J. LaDuca
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

Telephone: (202) 789-3960
Facsimile: (202) 789-1813

D. Aaron Rihn
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street
Pittsburgh, PA 15219
Telephone: (866) 273-1941
Facsimile: (412) 281-4229

Joseph S. Bellissimo, Esq.
BELLISSIMO & PEIRCE
120 Fourth Street
Ellwood City, PA 16117
Telephone: (724) 758-5544

Sandra Cuneo
CUNEO GILBERT & LADUCA, LLP
11620 Wilshire Boulevard, Suite 900
Los Angeles, CA 90025
Telephone: (310) 582-5939
Facsimile: (310) 582-5943